### LUND v KLINE

Ohio Appeals, 2nd Dist, Franklin Co

No 2724. Decided April 10, 1937

Corkwell & Wright, Columbus, for plaintiff-appellee.

Vorys, Sater, Seymour & Pease, Columbus, for defendant-appellant.

## OPINION

By GIEGER, J.

The action below was one to recover damages for injuries received by the plaintiff in an automobile accident. The verdict of the jury was in favor of the plaintiff, in the sum of $2,700.00; such verdict being signed by ten members of the jury. A motion for a new trial was filed, and overruled.

The assignment of errors submitted by the defendant are:

1. The jury was guilty of misconduct, by which defendant was prevented from having a fair trial.

2. The verdict is illegal because it was a result of chance.

3. The verdict is contrary to law.

The assignments 4, 5, 6, 7, 8, 9 and 10 refer to alleged errors of the court, and will be noted in more detail as they may become of importance. The assignments of errors 1, 2 and 3 may be discussed together, as they all relate to the alleged misconduct of the jury.

The complaint is that the verdict was a quotient verdict, arrived at by each of the ten members of the jury finding in favor of plaintiff, submitting a figure, which, added together, totaled $27,000.00, and being divided by ten (10), the concurring number of the jury, resulted in $2,700.00, the verdict returned.

A number of affidavits are included in the bill of exceptions. We may note their allegations briefly, beginning with that of George E. Frater, an associate of the law firm representing defendant below.

He states that the cause was submitted to the jury on May 15, 1936, at approximately 4:30 o'clock P. M.; that the jury returned a verdict at 5:00 P. M.; that he was present in court, and overheard some conversation not pertinent to the misconduct of the jury; that immediately at the conclusion of the conversation between Mr. Ford and Mr. Glenn (a juror), he accompanied Mr. Ford into the room where the jury had deliberated, and assisted Mr. Ford in taking from the waste paper basket ten slips of paper, on each of which a figure was written, and that he personally examined said slips of paper; that one disclosed the figure $5,000.00, four, the figure $3,000.00, three, the figure $2,500.00, one, the figure $2,000.00, and one, the figure $1,000.00; that he saw Mr. Ford pick up a sheet of paper on which the affiant saw that the above figures were added to the sum of $27,000.00,

then divided by ten, showing a result of $2,700.00. The record shows that the verdict was signed by ten members of the jury.

The affidavit of Mr. Ford states that he was a member of the law firm representing defendant; that immediately after the jury had reported he talked to H. W. Glenn, the foreman of the jury, and inquired of said H. W. Glenn how the jury arrived at the amount assessed, and H. W. Glenn informed him of the manner in which the jury arrived at the verdict. This part of the affidavit can not be considered, because it was simply a recital of what the juror told Mr. Ford. The pertinent part of the affidavit recites practically the same facts as recited by George E. Frater, which need not be repeated.

Attached to an exhibit are twelve purported ballots, ten having written upon them the word "yes," and two, the word "no", although as to one of these negatives it might equally be read "yes." Attached also are the purported ballots with figures as follows: One $1000, two $2,000.00, two $2500, four $3,000, and one $5,000. There is also attached to the exhibit the slip spoken of by affiant as adding $27,000.00, made up of the following figures:

$$\begin{array}{r} 10,000 \\ 7,000 \\ 1,000 \\ 9,000 \\ \hline 10/\ 27,000 \\ \hline \$\ 2,700 \end{array}$$

There are also included in the bill of exceptions the affidavits of nine of the jurors, eight of whom signed the verdict, and one of whom did not. Two signing did not file affidavits. It will not be necessary to recite the contents of all these affidavits, but we may use that of H. W. Glenn, foreman of the jury, as being typical.

He states that after the jury retired to deliberate, he was elected as foreman, and so served; that after he had been elected a ballot was taken on separate slips of paper to determine whether a verdict would be returned for plaintiff, and ten jurors voted "yes," and two voted "no"; that the ten who voted "yes" decided and agreed that each should write down on a slip of paper the amount he or she thought the verdict should be; and that these amounts added together and divided by ten would result in the amount to be assessed as damage; that the jurors further agreed that they would each sign the verdict, and agreed to abide

by and be bound by said result, and that in accordance with the agreement, each of the ten voting in favor of plaintiff wrote on a separate slip of paper the amount he or she thought the amount of the verdict should be; that immediately thereafter Mrs. Smith and Mr. Jobes added the figures on the ten slips of paper, and that they totaled $27,000.00; that they divided said total by ten and got $2,700.00 as the result; that Mrs. Smith inserted this amount in the form of verdict for plaintiff which was sent to the jury room with the jury; that thereafter the ten jurors who voted for the verdict for plaintiff signed the verdict, and thereafter in open court agreed that that was their verdict; that it was late in the afternoon when the court sent the jury to the jury room to deliberate; that several of the jurors were anxious to complete their work and get away; that the slips of paper exhibited to him by Mr. Ford appear to be the slips used by said jurors in balloting to determine whether the verdict should be for the plaintiff or defendant, and for the purpose of determining the amount of the verdict; that the larger slip of paper contained the figures 10,000, 7000, 1000 and 9000, the total 27,000, the division of said 27,000 by ten. The resulting figure 2700 was the figure he or Mrs. Smith used in inserting the amount of the verdict.

Mr. Glenn stated that Leon Jobes and Mrs. Smith added the figures. Mr. Leon Jobes states in substance the same as Mr. Glenn, and that ten jurors voted "yes", and two voted "no"; that the ten voting "yes" decided that each would write the amount to be given, and that these amounts would be added together and divided by ten, the result to be the final verdict, and that each of the ten would sign the verdict; that this procedure was followed and the resulting quotient was $2700 which each of the ten jurors signed as the verdict, and it was then immediately returned to the court; that there was no discussion in the jury room as to the value of the plaintiff's damages or injuries, or the loss of business, and there was no discussion as to the amount of the verdict after the figure of $2,700.00 was determined, as above set forth.

Mrs. Smith does not appear to have made an affidavit.

Without going further into detail with the affidavits, it would appear that they are in practical harmony to the effect that it was late in the afternoon when the jury retired to the jury room; that after they had ascertained that ten jurors were in

favor of a verdict for the plaintiff, these ten agreed that each should write the figure that he or she thought should be the amount of the verdict, and that the ten having done so the total amounted to $27,000.00. which being divided by ten, resulted in $2,-700.00, the amount of the verdict; that before setting down their figures they all agreed to abide by the result of the quotient; that there was no further or other discussion as to the amount, and no consideration of the plaintiff's injuries, nor of the amount of damage to him, resulting from such injuries.

The problem before the court is whether or not, under these conditions, the slips of paper found in the jury room and displayed in the bill of exceptions afford sufficient evidence aliunde to permit the consideration of the affidavits made by the jurors themselves.

At the outset we may say that we are of the opinion that the signing and exhibition of the ballots, and the ▮▮▮▮▮▮ slips of paper indicating the quotient verdict would not of themselves be sufficient to justify the setting aside of the verdict, for the reason, among others, that they do not determine the very important point whether the jury used the quotient as the amount of the verdict without considering and discussing the figure.

It very often happens in a jury room that in order to get some ground for discussion, and to ascertain the views of several of the jurors a quotient of their respective figures is used as a basis of discussion, and the presumption is in all such cases that the jury arrived at a verdict after discussion and proper consideration of all the pertinent evidence, and that the quotient figure was merely used as a basis for further discussion.

Neither are we of the opinion that the affidavits of the jurors as displayed in the bill of exceptions afford sufficient ▮▮▮▮▮▮ ficient grounds for setting aside the verdict, even though these affidavits each severally disclosed the fact that the jurors had used this method to arrive at the condemned quotient verdict, for the reason that the authorities have been quite uniform in holding that the jurors may not be heard to impeach their own verdict, unless there is evidence aliunde that justifies admission of their affidavits.

The question resolves itself to this: If the slips of paper, in themselves, without other evidence, are not sufficient, and if the affidavits, in themselves, are not sufficient, do the slips open the door to admit the affidavits where the affidavits alone disclose the essential element that the jurors agreed to abide by the result, and did, as a matter of fact, do so.

Of one thing there can be no reasonable doubt, and that is that the jury did, as a matter of fact, arrive at the sum shown by their verdict by resorting to the condemned quotient.

The question now is whether this court, knowing that such a verdict is obnoxious to every principle which should control the deliberation of the jury, is denied the right to consider the evidence produced by the ballots and the affidavits, to correct a miscarriage of justice, simply in deference to the rules that have been enunciated for the protection of the sanctity of the jury.

Must we say that it is true the jury arrived at its verdict by the use of a forbidden device, and that the rights of the parties were disregarded, and it is true that we know this to be a fact, but we must hold that we can not permit the jury to impeach its own verdict, in deference to ancient rules?

## THE LAW.

It will not be profitable to analyze in detail all the cases touching a quotient verdict, but a few principles may be stated and an examination made of pertinent Ohio decisions.

"It is generally considered to be a ground for a new trial if the jury arrived at a verdict by chance or luck, by agreeing to accept the result of a majority vote, or by any method other than that of weighing the evidence and exercising their judgment. It is upon this principle that a quotient verdict, returned by a jury in a civil action, as the result of a previous agreement to accept such an amount, is sufficient to warrant a new trial. But if the respective jurors deliberately assent to and accept the amount which has been ascertained by dividing the aggregate of their several estimates by twelve, as in their opinion a just verdict, and so return it, the verdict is not objectionable, and is not a ground for a new trial."

**30 O. Jurisprudence, pp. 66, 67, §34.**

After speaking of the invalidity of a quotient verdict where there has been an agreement to accept it, and pointing out that the impropriety consists not so much

in the method, but in the prior agreement to be bound by it, it is stated:

"* * * it is equally well settled that a quotient verdict will not be held legally objectionabe if, after the amount has been ascertained, the respective jurors deliberately assent to and accept the amount so obtained, as in their opinion a just verdict, and so returned it, if (as) it can not be inferred that the jury intended to accept the quotient as the sole basis of its verdict."

39 O. Jurisprudence, p. 1104, §375.

The court in the case at bar in passing upon the motion for a new trial, stated the matter thus:

"The universal rule is that the conduct of the jurors in the jury room can not be gone into unless there is evidence aliunde. This is said to be supplied by the ballots and papers containing the computation retrieved by the defendant's counsel after the jury had returned the verdict. Inasmuch as these are as consistent with a proper determination of the case by the jury as an improper one, the court is of the opinion that they did not furnish the aliunde evidence necessary to successfully impeach the jury's determination."

It may be observed that the court was mistaken in the number of jurors who concurred in the verdict, in stating that there were nine instead of the correct number, ten.

We next examine the case of Stadium Cab Company v Shawd, decided by the Court of Appeals of Franklin County, Judge Hornbeck delivering the opinion:

"1. A quotient verdict, which represents the total amount which the various jurors thought a party should recover, divided by the number of jurors participating, is illegal because it is the result of chance.

"2. Before the affidavits of jurors can be accepted to impeach their own verdict, there must be evidence from other sources tending to show irregularities in the verdict.

"3. Where such extraneous evidence consists only of a set of ballots retrieved from the jury room and a sheet of paper containing additions of figures and uncompleted divisions of the results by 12, and the figures on the ballots and on the sheet of paper are not the same and no combination of such figures added together and divided by 12 will give a quotient of the same amount as the amount of the verdict, an intention to accept a quotient as the sole

basis of the verdict can not be inferred."
36 O.L.R. 456, 12 Abs 106.

This case is of special interest because it was decided by our own Court of Appeals. Judge Hornbeck states on page 108, The Abstract; 459, The Reporter.

"Before the affidavits of the jurors who participated in the trial and verdict can be accepted to impeach their own action, there must be testimony from other sources tending at least to show the irregularities which are set forth in the affidavit of the jurors themselves."

An examination of the ballots in that case disclosed that there was no possible combination of the figures producing a total which divided by twelve would equal the verdict returned; and it is stated on page 108, the Abstract; 460, the Reporter:

"The verdict returned would not be a quotient of any set of figures presented to us, and as it is different it must be presumed that it represents the independent composite judgment of the jurors signing the verdict."

The court in that case held that before the affidavits can be accepted to impeach the verdict there must be evidence from other sources tending to show its irregularities, but that under the conditions disclosed, an intention to accept the quotient as the verdict can not be inferred, and that, therefore, the affidavits could not be accepted.

This was a negative holding, and possibly does not go so far as to say definitely that if the figures clearly indicate that the amount of the verdict was a quotient, that such a fact would make competent the affidavits of the jurors stating that that method of arriving at the verdict had been agreed upon in the jury room and had been adhered to after the quotient had been arrived at.

We, therefore, do not feel that this case is conclusive, although it undoubtedly indicates that the only consideration in influencing the court was that the figures furnished did not indicate that the verdict was, as a matter of fact, a quotient. It has been pointed out and is a fact that in the present case the sheet attached to the bill of exceptions, indicating a total of $27,000.00, and indicating it was divided by ten, to reach the verdict of $2,700.00, does not show the addition of ten separate sums, as disclosed by the ten several ballots, it be-

ing made up of $10,000; $7,000.00; $1,000.00; $9,000.00; total $27,000.00. However, each of these separate larger sums can be reached by some combination of the separate smaller sums shown by the several ballots, and it can be readily assumed that those who added the ten separate sums resorted to a short cut in finally adding only four. But each of the four is a combination of the smaller sums, except the figure $1,000.00, which was in itself the amount on one of the ballots.

Courts in refusing to accept the affidavits of the jurors to impeach their own verdict, have always made the reservation that if there was other evidence of some kind touching the irregularities of the verdict, the affidavits might then be considered.

The case most frequently referred to is the ruling made by Lord Chief Justice Mansfield, in 1785, in the case of Vaise v Delaval, 1 T.R. 11 (K.B.), where a verdict was arrived at by the tossing of a coin, and affidavits of jurors were offered. The entire opinion of Lord Chief Justice Mansfield as to the admissibility of the affidavits is as follows:

"The court can not receive such an affidavit from any of the jurymen themselves, in all of whom such conduct is a very high misdemeanor; but in every such case the court must derive their knowledge from some other source, such as from some person having seen the transaction through a window, or by some such other means."

The effect of that decision seems to be that the affidavits of the jurors would not be accepted under any condition, but that reliance must be had upon outside evidence. If that be the correct effect of that opinion, it has been very considerably modified by decisions in Ohio.

The first case we cite in Ohio is that of Hulet v Barnett, 10 Ohio 459, wherein it is held that "the testimony of jurors will not be received to impeach their verdict; nor is their testimony admissible on an application in chancery for a new trial, to show an intermeddling of the constable in the jury room, where the verdict was not against law or evidence."

This case only involves the consideration of the admissibility of the affidavits of the jurors, and does not consider evidence aliunde. It does, however, give pertinent reasons why the affidavits of the jurors are not competent. The court states:

"As regards the charge of misconduct on the part of the jury, the only evidence consists of the depositions of two of the jurymen themselves. Now, if there is any rule which can be considered as completely settled, and which has been framed for the purpose of setting bounds to the discretion of the court, it is that testimony of this kind should not be received. The rule is a most wholesome one, inasmuch as it is founded upon the wisest reasons of public policy. If an inquisition of this kind were to be established over the conduct of the jury, there is no knowing where it would terminate. It would produce a great deal more mischief than it could by possibility prevent. It would degrade the jurors in their own estimation, and in the estimation of the public, and they would soon lose that character of independence which gives value to the institution."

(10 Ohio 460).

In the case of **Farrer v The State of Ohio, 2 Oh St 54**, it was held that the general rule undoubtedly is, that affidavits of jurors are not admissible to impeach their verdict. But where other testimony is given tending to show that the jurors, in their retirement, had in their possession a newspaper containing a part of the charge of the court, affidavits of jurors may be received to show what the paper was, if their possession and use of it does not involve a charge of improper motives on the part of the jurors. It appears that the jurors, while in their room, had conversations with various people on the outside, some in reference to the progress of the case, and some in reference to immaterial matters, but no conversation on the merits of the case took place. These facts were not disclosed by the testimony of the jurors; other facts resting on the proof taken from members of the jury themselves are shown by the bill of exceptions. These other facts were to the effect that the jury had in its possession a newspaper containing a part of the charge of the court, in reference to material matters, and that such newspaper was read in the jury room.

Judge Corwin, in delivering the opinion, said:

"I have no doubt, the general rule of policy, and a just regard to the sanctity of the province in which the jury is appointed to act, are against the reception of such evidence, in an ordinary case; but in one where life or even liberty is threatened

by misconduct of the jury, it will readily be conceived, that circumstances may exist, which would not only admit, but demand, the examination of members of the jury, as to their alleged bad behavior. In every such exceptional case, a foundation must undoubtedly be laid for the introduction of affidavits by jurors, and it would seem that this foundation ought, in general to consist of knowledge acquired by the court by other means, than the affidavits of jurors themselves. When once the court have reason to believe, that the misbehavior of jurors may have given a wrong direction to their verdict, it may be well, in a proper case. to explain or enlarge the evidence of actual misconduct by testimony taken from the jury itself.".

"To this extent, at least, I think it safe and just to regard the affidavits of jurors as admissible; and while courts can not too sacredly regard the purity and freedom of a jury's action, I deem it a duty as well as a right to protect the alleged criminal from a misconduct, almost as reprehensible as that with which he may be accused, by accepting the best evidence which can be offered of the wrong done, not so much to the individual accused, as to the administration of justice itself, when a jury trifles with its duty, or forgets its high and solemn obligations."

It was held that the court having a prima facie case of misbehavior in the jury, it could well consider further facts provable by the affidavits of particular jurors.

In the case of **Kent v State, 42 Oh St 426,** (a criminal case), it was held that where a juror, after the jury had retired to deliberate, makes to his fellow jurors a statement contradicting in an important particular the testimony of the defendant's witness, ground is afforded by such misconduct for a new trial,

"where the fact is properly made to appear; but the affidavits of jurors will not be regarded for the purpose of setting aside the verdict, until misconduct of the jury is shown aliunde."

Judge Okey, delivering the opinion of the court, states on page 436, in substance, that if the affidavits of the jurors were admissible they presented a case which called upon the court to grant a new trial, and says:

"But there was no evidence of misconduct, except that contained in the affidavits of jurors, and the statements in affidavits had relation alone to what took place in the jury room, and effected, in a sense, each and every juror. Hence, applying the ordinary rule, that the affidavits could not properly be considered until some evidence other than the testimony of jurors had been offered, no case for setting aside the verdict was shown."

**42 Oh St 426.**

In the case of **Coins v State, 46 Oh St 457,** it is disclosed, at pages 471 and 472 that the affidavits of jurors were offered to prove misconduct of the jury from which it appeared that the jury first stood six to six for a certain verdict, and finally, six for manslaughter, and six for murder in the second degree, and that it was then agreed that twenty-four ballots would be prepared, twelve for manslaughter and twelve for murder in the second degree, and that twelve of these should be drawn from a hat, and the verdict should be as a majority, thus drawn, should appear, and that this ultimately resulted in eight ballots for murder in the second degree, and four for manslaughter, and that a verdict was rendered for murder in the second degree. There was no other evidence of this misconduct than the evidence of two jurors. It is stated by Judge Bradbury, delivering the opinion of the court, that there only remained in proof of the alleged misconduct the two affidavits of the two jurors; ample proof if the evidence was competent.

Bradbury, J., says, on page 472:

"And thus it may appear to all the world by the subsequent statements of the jurors, that the liberty of a citizen has been gambled away in a jury room, yet the court is powerless to interfere, because the policy of the law is, first, to seclude the jury, and second, not to allow their evidence to impeach their verdict."

"As a general rule, no doubt, this doctrine is founded on the soundest principles of public policy * * *. But a case like this at bar strains the principle to its utmost tension, and suggests a doubt whether there may not be found a carefully guarded exception to a rule, the universal application of which may present a spectacle so discreditable to our jury system."

The court did not definitely pass upon the question because its determination was not necessary to the decision of the case.

The next case in point of time is that of **Lorain Steel Company v George Hayes, 6 O.C.C. (N.S.) 353:**

"While an indeterminate quotient verdict is utterly indefensible, a verdict will not be set aside for misconduct on the part of the jury, where it does not appear that it was agreed by the jurors prior to its ascertainment that a verdict thus obtained should be binding upon them, or that there was a failure on the part of any juror to give his individual untrammeled assent to the amount of the verdict after its ascertainment and before its rendition."

"A juror can not, by affidavit, impeach his verdict by an attempt to prove that it was rendered through a misunderstanding of the court's charge, or by showing an intention different from that disclosed by his verdict."

**(Long v Cassiero et, 105 Oh St 123).**

This, of course, is not the case at bar, but is interesting on account of the court's decision. The court, after commenting upon the fact that the affidavits are not incorporated in the bill of exceptions, and therefore can not be considered, says, on page 126:

"It is clear that the purport of these several affidavits is an attempt to impeach the same by the individual jurors. That this can not be done has been repeatedly held by this court, as shown by the following cases."

There is an interesting discussion of the entire subject in the dissenting opinion of Marshall, C.J., beginning at page 129.

In the case of **Schwindt v Graeff, 109 Oh St 404,** it is held:

"The rule that the verdict of a jury may not be impeached by the evidence of a member of the jury is a common-law rule founded upon public policy, and not upon the doctrine of estoppel, and the fact that a juror offering such impeaching evidence did not join in the verdict does not exempt such evidence from the operation of the rule. The legislature, and not the courts, is empowered to modify or abrogate the rule."

This case might be pertinent in that one affidavit is offered by a juror not concurring in the verdict, but is of no importance in this case, inasmuch as eight jurors who did sign the verdict submitted affidavits.

Judge Marshall, in a dissenting opinion, on page 414, says:

"I entertain the strongest convictions of the efficiency of the jury system, but I deny that it is entitled to protection against disclosures of criminal or other reprehensible conduct, and I assert that it only tends to discredit the jury system, and therefore to measurably bring the entire judicial system into disrepute, to deny to jurors the right to testify concerning misconduct in the jury room."

He analyzes the several decisions of the Ohio and other courts, and also points out the fact that certain sections of the code have designated who may and who may not testify, and that the testimony of a juror is not excluded.

The latest opinion of the Supreme Court is that of **Emmert v State, 127 Oh St 235,** wherein it is held:

"Affidavits or testimony of jurors may be received, upon motion for new trial, to prove unlawful communications made to members of the jury by court officers or others, outside the jury room but during the period of the jury's deliberations."

The record in that case shows very reprehensible conduct upon the part of the regular and special bailiffs in communications to the jurors when outside the jury room, in going to and from the places where they dined. That these communications were sufficient to sway the jury, is apparent from the fact that the record discloses that when the jury was first approached by the bailiffs it stood nine to three for acquittal, and that it ultimately brought in the verdict of guilty.

It will be observed that this case does not involve any other testimony as to the conduct of the court officials, than that included in the affidavits submitted by the jurors.

The Ohio cases are examined at large, and Judge Bevis, in his opinion, says at page 246, in substance:

"Summarizing the foregoing conclusions, we are of the opinion that there is a public policy to be served in protecting the privacy of the jury's deliberations. That the end to be attained thereby is of even greater importance than the result in an individual case has been repeatedly held by this court. But, in our opinion, this policy does not require that acts done or communications made to members of the jury, outside the jury room or apart from their deliberations, be similarly protected from disclosure by the jurors."

We are under many obligations to Judge Patterson for his very carefully considered

case—**Walker v Union Cincinnati Life Insurance Co., 6 Ohio Opinions, 439,** in which he held slips of paper found by counsel and there identified not only by the person finding them, but by the foreman of the jury, furnishes presumptive evidence that the verdict was a quotient verdict, and opens the door for the consideration of the affidavits of the jurors, which clearly disclose the fact that the jury agreed to proceed in the method indicated, and abide by the result without further consideration or discussion. Judge Patterson's opinion is most carefully considered, and is highly instructive.

We are conscious of the fact that courts have been very careful to preserve the privacy of the jurors' actions in the course of their deliberations. We agree that there is a public policy to be served in protecting this privacy. We, however, are conscious of the fact that this policy may lead to serious consequences, and believe there should be a reasonable limit upon the indulgence to be shown where there is no doubt that the jury has as a matter of fact arrived at its verdict in a manner forbidden by law.

Counsel for plaintiff suggests that if courts permit retrieved scraps of paper, found in the jury room, to be the basis for the introduction of affidavits of the jurors, impeaching their own verdict, that there will be an unseemly scramble to search the jury room for evidence that may permit the introduction of the affidavits of the jurors. There may be some foundation for this apprehension, but we believe that if the jurors come to realize that they can not take this short cut to discharge the obligations they owe to litigants and to the public, there will be fewer quotient verdicts than under the belief among jurors that their verdict can not be challenged because it has been arrived at in an objectionable manner. There must be, in the words of Judge Bradbury, "a carefully guarded exception to a rule, the universal application of which may present a spectacle discreditable to our jury system."

We hold that the production and identification of the ballots used by the jurors, indicating a quotient verdict ▮▮▮▮▮▮ opens the door for the consideration of the affidavits of the jurors, as to what occurred in the jury room, including the agreement of the jurors to abide by the result. We are of the opinion that the affidavits ▮▮▮▮▮▮ should have been considered by the trial court, and that

they, together with the slips identified required the court to sustain the motion for new trial. The court erred in overruling the motion.

ASSIGNMENT OF ERRORS 5 AND 6.

Complaint is made that the court erred in excluding from the jury evidence tending to show that there had been a compromise of the claim asserted in the petition, and that the plaintiff was estopped by reason of having accepted money from an insurance company.

We do not believe that the settlement as disclosed by the evidence estopped the plaintiff from asserting his claim against the defendant, and it was not error of the court to exclude it.

As to assignments seven and eight, the claim is made that the correct measure of damages in a personal injury case does not include the loss of profits of a business, but that the recovery should be confined to loss of earning power, as distinguished from the profits of the business in which the plaintiff was engaged.

The plaintiff in this case was engaged in a peculiar business, that of soliciting orders to be filled through the work done by tailors employed by the plaintiff. He testified (p. 11-12) that his loss for the season was $2,000.00 by reason of the disability caused by the accident.

We are cited to **LoSchiavo v Northern Ohio Traction and Light Company, 106 Oh St 61;** and also **Hanna v Stoll, 112 Oh St 344,** (2nd Syl.); also **Phillips v Board of Education, 21 Oh Ap 194-208.**

We believe that due to the character of the plaintiff's business, and the method in which he conducted it, that the evidence submitted to the jury was competent, and that there was no error in permitting it to go to the jury.

Judgment reversed—case remanded.

BARNES, PJ, and HORNBECK, J, concur.