No. 31,604

CORA D. YOUNG, *Appellee,* v. IDA E. JACKSON, *Appellant.*

(36 P. 2d 91.)

Opinion filed October 6, 1934.

*J. P. Noble* and *John M. Bremer,* both of Oberlin, for the appellant.

*Wallace T. Wolfe,* of Oberlin, *T. D. Relihan* and *A. W. Relihan,* both of Smith Center, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one by Cora D. Young against Ida E. Jackson to recover real estate. The district court awarded to plaintiff an undivided one-half interest in the land. Both parties appeal. The basis of recovery was that defendant derived title

from one who held the land, as trustee by implication of law, for plaintiff as beneficiary.

Cora D. Young was the daughter of James J. and Albertina Jackson. The real estate consisted of three small tracts, aggregating about six acres, adjoining the city of Oberlin, which were purchased in the 1890's and consolidated into a homestead. Title was taken in Mrs. Jackson's name. Subsequently some improvements were erected with money inherited by Mrs. Jackson from her mother.

In 1892 Cora Jackson married Joseph H. Young and left the home of her parents. About 1928 Mrs. Jackson became afflicted with cancer. From May, 1930, she was bedfast, and she died intestate October 6, 1930. Young testified he had conversations with Mrs. Jackson, and the substance of the conversations was that "Mrs. Jackson was very much interested in seeing that eventually the home became the property of Mrs. Young."

On February 1, 1929, Mrs. Jackson made deeds of the parcels comprising the homestead to her husband, and the deeds were recorded on February 2. After his wife's death Jackson continued to occupy the real estate as his homestead.

Within a week or two after Mrs. Jackson's death, or sooner, Young was after Jackson for a deed to Cora. Jackson said he would like to keep the property in his name for a while. Young said, "Yes, Jim, but that was not the agreement." The record fails to disclose any agreement by Jackson that he would deed the land to Cora immediately or soon after Mrs. Jackson's death, or that he would ever deed it to her; and the record contains no evidence of any desire by Mrs. Jackson that her husband should be subject to eviction as soon as her funeral was over. There was much subsequent urging of Jackson to make a deed to Cora at once, and usually one ground was an "agreement" to do so, which he never made.

Before and after the deeds were made, and after Mrs. Jackson's death, Young was deeply involved in debt. He testified that in one conversation with Jackson about making a deed to Cora, Jackson told Young of a conversation Jackson had with Gerald Benton, who was a banker at whose bank Young did business. Benton said they were going to clean house with Young; they were going to take judgments against Young and on notes on which Mrs. Young was a signer as well as Young; and they would proceed to take property, too.

An attorney was employed to induce or compel Jackson to make a deed to Cora at once. In conversations with the attorney Jackson said he expected Cora to get the property eventually, but he would like to keep it as long as he lived; if he made a deed he would have no place to go. The attorney reported he had consulted Cora, and a deed to her reserving a life interest in Jackson would be satisfactory. In conversation with the attorney Jackson said Cora was to have the place, it was to be hers, and he intended to fix it by a will. That was not satisfactory to the attorney, because a will might be changed. On one occasion Jackson told the attorney it was understood Jackson was to keep the property out of Joe Young's clutches, and Jackson was not going to allow it to get into Young's hands as long as Jackson lived.

The fact was that in 1921 Jackson made a will giving his property to his wife for life, and after her death to his daughter, Cora, if living, and if not, to her children. After Mrs. Jackson's death Jackson showed this will to Cora. There was testimony he said he would not change it, and in response to importunities and threats of litigation he said, "You know that Cora gets this property anyway, and why make a fuss about it?"

There was testimony relating to an agreement between James and Albertina Jackson with reference to the homestead, which came about in this way: In January, 1929, at the Jackson home, Mrs. Jackson catechised Young with reference to his financial condition. James Jackson was present. Young told what occurred:

"She said to me, 'Joe Young, I understand you are pretty badly in debt, is that so?' I said, 'Yes, I owe quite a bit of money . . .' And she said, 'You are pretty badly in debt, aren't you?' I said, 'Yes, if that is the way you want to put it, I am.' 'Well,' she said, 'what effect is that going to have on my giving Cora this place of mine, which you know I have always said I would do?' and she said, 'Wouldn't that be affected if you got into a lawsuit . . .?' I think it was Jackson that spoke up next, though, Jim Jackson says, 'You deed that to me, I will see that Cora gets it; they can't take it if it is in my name.' I think Mrs. Jackson asked me the question whether they could or not, and I think I said I didn't believe they could, . . . and she said, 'Well, if you are in debt and that will fix it, I think that is what we will do.' She says, 'If you make up a deed I will sign it.' I said, 'No, no, not in the family.' I said, 'If you want to deed that to Cora or deed it to Jackson, deed it to anybody, you get somebody else.' Jim Jackson says, 'I will get somebody to take care of the deed business.' "

There was some further conversation of no present consequence, and Young withdrew. Probably Jackson had deeds prepared and,

as indicated, Mrs. Jackson signed them on February 1. Originally there were three deeds to Mrs. Jackson, and for convenience in description of the homestead tract, three deeds containing the original descriptions were made.

Jackson and Mrs. Jackson are dead and cannot tell what passed between them just after Young left the Jackson home following the interview referred to, or before or at the time the deeds were signed. Cora's attorney said Cora did not know any deed had been made until after her mother's death, and, as indicated, after Mrs. Jackson's death Jackson told the attorney Jackson's understanding with his wife was Jackson was to keep the homestead out of Joe Young's clutches.

On November 16, 1931, Jackson married Ida E. Burns, a widow with three children. Jackson and his second wife continued to occupy the land until his death, which occurred on August 16, 1932. After Jackson's death the widow continued to occupy the homestead.

The second Mrs. Jackson had some bonds and other personal property and had some land in Nebraska. Jackson had both real and personal property. On January 29, 1932, and pursuant to an antenuptial agreement made in consideration of marriage, they executed a formal written agreement with respect to their property. All the property of each was pooled in a common fund for the common use and benefit of both during their joint lives and for use and benefit of the survivor for life. At the death of the survivor the remainder of the combined estates was to become the property, share and share alike, of Jackson's child, Cora Young, and his widow's children, Ira A. Burns and Bessie Beisner. On the same day the parties executed a joint will to effectuate the contract. On Jackson's death the will was duly probated, and Ida E. Jackson was appointed executrix.

The action was commenced on September 24, 1932, by Cora D. Young against Ida E. Jackson and her children. As indicated, judgment was rendered for Cora D. Young, based on a finding of a resulting trust in her favor.

The petition pleaded fraud, duress and undue influence practiced by James J. Jackson to procure the deeds from his wife, Albertina Jackson, and pleaded her incapacity to transact business. These charges were all abandoned at the trial. Joe Young furnished the testimony with respect to what induced execution of the deeds.

They were made to Jackson to protect Cora, and on Jackson's statement he would see Cora got the land. There was no room for implication of anything from anything. The statement was oral, and the statute of trusts forbids the enforcement of it:

"No trust concerning lands except such as may arise by implication of law shall be created, unless in writing signed by the party creating the same, or by his attorney thereto lawfully authorized in writing." (R. S. 67-401.)

Commingled with the allegations of fraud, imposition and incompetence, were some allegations that a fiduciary relationship existed between Jackson and his wife relating to business and property affairs. Plaintiff contends there was evidence of such a relationship.

Cora testified her mother always placed confidence in her father. Of course she did. They were married in 1874, in Iowa, moved to Kansas, lived on a farm, purchased and improved a homestead at the edge of town, and lived together until the wife died. The testimony was he treated her with kindness, there was no trouble between them, and the confidence of a congenial matrimonial relation was well proved. That relation sustains the deeds as written, and the law protects the relation by requiring that evidence of some oral agreement which would convert the instruments into something contrary to their purport shall be rejected.

An effort was made to show a sort of supremacy of the husband in business and property affairs, suffered by the wife in trustfulness, which would make him a quasi agent or manager for her, upon whom the law imposed duty to be faithful.

Cora testified her mother always listened to her father. Then in order to fortify her case in another respect, Cora proceeded to prove that after listening to her husband Mrs. Jackson did not uniformly do as he wished. On occasions he wanted to mortgage the homestead, and she refused. The result is, Cora's vaporous statement was well aided by the testimony.

Cora testified her father took care of all the business affairs, and her mother never transacted any business Cora knew of. Joe Young gave testimony to the same effect. Young said Mrs. Jackson might have purchased groceries and things like that, "but as to business concerning properties, either buying or selling, she never did." The record is barren of evidence that there ever was any business of buying and selling properties.

Some thirty-seven years before Mrs. Jackson died the tracts con-

stituting the homestead were purchased, and title was taken in Mrs. Jackson's name. It is not material, but there was no evidence with respect to who furnished the purchase money. Not long afterward Mrs. Jackson received a sum of money, said to be about $2,000, from her mother's estate. The testimony on the subject of improvements was that Mrs. Jackson desired the homestead should be improved, improvements were made, and Jackson looked after the work. Whether all of Mrs. Jackson's money went into improvements, or otherwise went into the home, does not appear. If there was a remainder, there is nothing to show what became of it. There was evidence Jackson did business, but the record is barren of evidence that for the last thirty-five years of her life Mrs. Jackson had any business or property of her own to be conducted or managed, much less to be conducted or managed in a way to create a fiduciary relationship between her husband and herself respecting it.

The subject of trusts by implication of law was discussed in the opinion in the case of *Silvers v. Howard,* 106 Kan. 762, 190 Pac. 1, which reviewed earlier cases. There are subsequent cases applying the decision in *Silvers v. Howard.* The facts of this case differ so widely from the facts in those cases that they are not comparable.

The essence of this case may be briefly stated: Mrs. Jackson desired Cora should have the homestead, and Jackson was in accord. In her last illness Mrs. Jackson put Joe Young "on the spot" in an interview which disclosed that a present deed to Cora would defeat the purpose of making it. Jackson interposed and suggested that a deed be made to him. If that were done creditors could not get the property, and he would see Cora got it. Mrs. Jackson turned to Young for his opinion. He agreed that creditors could not get the property. Mrs. Jackson's decision was promptly made. She said, "If that will fix it, that is what we will do," and soon afterward the deeds were made. The mother's purpose was to provide for her daughter in a way the gift would not be wasted. The method suggested to the mother was adopted, not because of the compelling force of a set of circumstances dominated by peculiar relationship to the person speaking, but because of what he said. Of course she expected the promise would be kept, which is true in all cases of land transactions based on oral promises, but the statute of trusts forbids that trusts regarding land be created that way:

"It is sometimes said that a constructive trust will arise whenever it would be inequitable for the person holding the legal title to retain the property. The statement is too broad, and if applied literally, would nullify the first and sixth sections of the trust statute. However inequitable and morally reprehensible it may be that property conveyed upon an express oral trust should be retained in violation of the agreement, a trust may not, under those circumstances, be engrafted upon a deed absolute in its terms, because if that were the rule, deeds would no longer be valuable as muniments of title. In the opinion of the legislature, it is better for the social order and general welfare that a few persons, who might not observe the statute, should suffer hardship, than that the security of all titles should be destroyed." (*Silvers v. Howard,* 106 Kan. 762, 768, 190 Pac. 1.)

While it is not important, plaintiff could not recover because of R. S. 67-402, which reads:

"No such trust, whether implied or created, shall defeat the title of the purchaser for a valuable consideration and without notice of the trust." (R. S. 67-402.)

Plaintiff undertook to plead the facts of her cause of action, and she pleaded the postnuptial agreement between James J. and Ida E. Jackson and the will made pursuant to the agreement, which was contractual. The instruments showed Ida E. Jackson was a purchaser for a valuable consideration, a fact which is not disputed. To show, as plaintiff was obliged to do, that Ida E. Jackson's possession of the land was wrongful, the petition pleaded in general terms that the contract and will were void as against plaintiff's interest. That necessarily implied Ida E. Jackson had notice of the terms on which James J. Jackson held title. There was no evidence in the district court that she had such notice. What evidence there was on the subject showed she had no notice.

To sustain her cross appeal plaintiff contends that if she should recover a half interest in the land she should recover the entire interest. In view of what has been said, the contention need not be discussed.

The judgment of the district court is reversed, and the cause is remanded with direction to enter judgment for the defendant.