**STATE, ex rel. HETZLER, Plaintiff, v. SNYDER, Defendant.**

Municipal Court, Piqua.

No. 487.   Decided May 10, 1950.

44

A. W. DeWeese, J. H. DeWeese, Piqua, for complainant.
Bernard S. Keyt, Piqua, for defendant.

### OPINION ON MOTION FOR NEW TRIAL
By CROMER, J.

This case has been tried twice to a jury. On the first trial to a six-man jury, there was a disagreement. On the second trial to twelve jurors, the verdict was unanimous in favor of the plaintiff. All the jurors signed the verdict. The Court, upon the return of the verdict. asked if either attorney desired to poll the jury. No indication was made of a desire to poll the jury. Hence, the jury was not polled.

Within proper time, the defendant filed a motion for a new trial. Altho the motion contains eight grounds, only two are urged with any degree of earnestness.

One ground goes to the instructions given by the Court. There was no objection made to the instructions of the Court, either general or special. This objection seems to have been waived.

First, it is urged finally that there is "Misconduct of the

jury prejudicial to the defendant and materially affecting his substantial rights of which the defendant did not and could not have had any knowledge prior to the rendition of the verdict."

Secondly, it is claimed by the defendant that there was error in "permitting the defendant to testify on cross-examination as the first witness in the trial, over objection."

These are the only errors claimed in the trial of the case and they will be taken up in the order indicated.

## 1. AS TO MISCONDUCT OF THE JURY

The attorney for the defendant brought into court, upon the hearing of the motion for a new trial, two witnesses, both of whom had been jurors in the case and both of whom had signed the verdict finding the defendant "guilty." Of the two witnesses called, only one of them was placed on the witness stand. The attorney for the plaintiff objected to the witness testifying because he contended that the evidence could only be shown only by deposition or by affidavit. The Court was of the opinion that the manner of producing the evidence was not too important—altho not strictly according to statute—but that there was a more important rule of evidence involved, namely, non-impeachment of a verdict by the testimony of a juror who rendered it.

Mr. Scott Watterson, a former juryman in the case, was placed on the stand and the following are the questions asked and the proffers made after the objection was sustained by the Court:

Q. "You rendered a verdict in that case as such member of the jury?"

Objection by Mr. DeWeese on the ground that proper foundation had not been laid.

Q. "You rendered a verdict of guilty as shown by the record in this case, did you not?"

OBJECTION SUSTAINED.

Q. "During the process of the trial, I'll ask you whether or not you made a statement, not trying to quote your exact words, and before all the evidence was before the jury and before you heard the charge of the court, if you made a statement that you did not see why it was necessary to go on with this case, as you had made up your mind"?

OBJECTION SUSTAINED.

MR. KEYT: "Let the record show that if the witness had been permitted to testify, he would have testified that he did make a statement to the effect that he didn't see why it was necessary to go on with this case because he had already made up his mind."

Q. "I'll ask you whether or not you did determine, prior to the time when all the evidence was in and before the charge to the jury, and if you had made up your mind what the verdict would be?"

OBJECTION SUSTAINED.

MR. KEYT: "Let the record show that if the witness had been permitted to testify, he would have testified that he had made up his mind what his verdict would be before he had heard all the testimony and before the charge of the court to the jury."

Q. "I'll ask you if in your deliberations, you discussed anything in the case pertaining to the blood test?"

OBJECTION SUSTAINED.

MR. KEYT: "Let the record show that if the witness had been permitted to testify, he would have testified that the jury discussed and deliberated questions as to blood grouping test and the effects and why it was not introduced into the evidence."

Q. "How many votes did the jury take on this case?"

OBJECTION SUSTAINED.

Q. "How many times did the jury take a vote in this case?"

OBJECTION: "The question has been asked before." Question withdrawn.

Q. "I'll ask you whether or not at any time before all the evidence was presented to the jury and before the jury heard the charge of the court, if you had determined what your verdict would be?"

OBJECTION SUSTAINED.

COURT: "You cannot impeach the verdict of a jury by the testimony of one of the jurors. This is upon authority of 39 O. Jur. Trial, Sec. 382, p. 1110, Impeachment of Verdict. This is the only authority we have been able to find in the few minutes remaining after we were informed of the question involved in this case."

The last proffer repeats that the juror had made up his mind before the "evidence was presented and before the charge to the jury."

At this point we wish to say that no proffer was made as to what the witness' verdict would be or in what respect his mind was made up. It is not indicated whether it was "guilty" or "not guilty," the juror-witness, having signed the verdict of "guilty" we must assume it would be "guilty." We cannot presume that the witness violated his oath. The presumption is the other way, namely, that he did his duty.

We must realize that this is an attempt, by the defendant, to overthrow the verdict by one juror, when, under the law of a three-fourths verdict, it would take at least four jurors.

What cannot be done directly ought not to be done indirectly. Suppose this witness who was a juror in the case, alone had voted "not guilty," what effect would it have had upon the verdict? None whatever. Even if the second witness had been called and testified as did the first—according to the proffer—the result would still be the same. Assuming the facts to be as proffered and, further, assuming the two juror-witnesses had made up their minds prematurely to vote "not guilty," it would make no difference in the final result.

Judge Cushing of the Court of Appeals of Pickaway County, **Phillips v. Board of Education, 21 Oh Ap 194** (2/4/1924) after citing several of the Ohio cases on the non-impeachment rule, said: "These cases were decided prior to the amending of the Constitution in 1912, and the enactment of the law that three-fourths of the jury could return a verdict."

"Syl. 5. Affidavits of jurors will not be received to impeach their verdict, **especially** in view of the amendment of the Constitution in 1912 providing that three-fourths of a jury may return verdict."

Upon the matter concerning "blood grouping test" mentioned in the proffer, the Court says that after the charge was read to the jury, one juror asked about a "blood test." The court said to the jury that there is no evidence in this case in regard to a blood test; that a blood test is an exclusionary test; that the jury must disabuse their minds entirely as to such a test and that the jury must not consider it at all. Up to the time of this inquiry by the jury, not a word had been said about a "blood test."

If the jury discussed such a test, it cannot be shown by the oath of a juror who signed the unanimous verdict, because there is no evidence **aliunde**—only from the juror himself. Since the word "aliunde" will appear several times hereafter in the cases cited, at this point it will be well to define the word. Bouvier's Law Dict. (Rawless Rev.) says: "**Aliunde** (Latin), From another place."

### TEXT AUTHORITY ON IMPEACHMENT OF VERDICT

53 Am. Jur. Trial, Secs. 1105 to 1108, Generally: "While matters of impeachment **extrinsic** to the verdict may, according to the view of many courts, be shown by the testimony of jurors, it is a long-established and generally accepted doctrine, except where modified by statute, that testimony or affidavits of jurors will not be received where the facts sought to be shown are such as inhere in the verdict."

This is the rule of the Federal courts and is followed in 36 states, including Ohio.

The same principle is stated in **Jones on Evidence (4th Ed—1938) Sec. 767, Impeachment of Verdict—Misconduct of Jurors**: "Jurors must understand that their deliberations **in the jury room are inviolable** and that the **reasons for** their verdict cannot be questioned. Accordingly, it is held that the testimony of affidavits of juror will not be received as to the jurors' deliberations in the jury room or to impeach their verdict. The statement of a juror is inadmissible to show that some of the jury did not in fact concur in the verdict or did not understand it, or to show a misunderstanding of the charge or the law applicable to the case. Similarly, a juror's testimony is not competent to show that a jury consented to the verdict because compelled by poor health to escape confinement, that the jurors were influenced by improper facts or by information improperly obtained during the deliberations of the jury or that the verdict was arrived at by lot or by some other improper procedure.

The courts adhere generally to the rule that the testimony of jurors will not be received to show their own mistake, misconduct, to prove that their fellows, while in the jury room, or otherwise to impeach their verdict * * * It has been held that the affidavits of jurors may be received to show any matter occurring during the trial or in the jury room which does **not essentially inhere** in the verdict itself —as that the jury was improperly approached by interested parties or their agents, that witnesses or others conversed concerning the case in the presence of the jurors, or that the verdict was obtained by average or lot or in some improper manner."

An affidavit of a juror may be used to "explain but not to impeach his verdict" or "in support of their verdict." **39 O. Jur. Trial, Sec. 382, p. 1110. Impeachment of Verdict—Evidence of Jurors** "It is a long established and a generally accepted doctrine, founded upon the "wisest reasons" of public policy, rather than upon any doctrine of estoppel, that the verdict of a jury may not be impeached by the testimony or affidavits of a member or members of the jury rendering the verdict unless there is evidence aliunde impeaching the verdict. In other words, to render a juror's testimony competent to impeach his own verdict, a foundation must first be laid by testimony from other sources tending at least to show the irregularities which are set forth in the affidavit, of the juror himself, and making out a prima facie case. To this latter extent, at least, it is safe and just to regard the affidavits of jurors as admissible. This foundation, however, must consist of knowledge acquired by the court by other

means than the affidavits of jurors themselves. * * * The rule above stated is so firmly established that the Ohio Supreme Court has declared that only the legislature, and not the courts, can modify or abrogate the rule, although there has been some contention by the courts for the abandonment."

In 1785 Lord Mansfield decided the case of Vaise v. Delaval, 1 T. R. 11, 90 Eng. Rep. 944 (K. B.). This is a leading case and the background of all the subsequent cases. Part of the opinion is as follows: "The court cannot receive such an affidavit from any of the jurymen themselves * * * but in every such case the court may derive their knowledge from some other source; such as from some other means."

There is a good discussion of the problem to be found in 27 R. C. L. Trials, p. 896.

8 Wigmore on Evidence, Sec. 2348a states the rule as follows: (P. 666)

"a.—The jurors' deliberations during retirement, their expressions, arguments, motives, and beliefs, represent that state of mind which must precede every legal act and is in itself of no jural consequence. The verdict, as finally agreed upon and pronounced in court by the jurors, must be taken as the sole embodiment of the jury's act. Hence it stands, irrespective of what led up to it in the privacy of the jury-room—precisely as the prior negotiations of the parties to a contract disappear from legal consideration when once the final agreement is reduced to writing and signed. The difference is that the parties need not have reduced their transaction to a single memorial (i. e. by integration) unless they wished to, while the law required the verdict thus to be made; but the effect is the same, when the act is once done."

"Sec. 2349 (a) JURORS' MOTIVES, BELIEFS, MISUNDER-STANDINGS. Intentions and the like, as Immaterial. For the reason already stated (ante, Sec. 2348, par. a) the verdict as uttered is the sole embodiment of the jury's act, and must stand as such without regard to the motives or beliefs which have led up to their act. The policy which requires this is the same which forbids a consideration of the negotiations of parties to a contract leading up to the final terms as deliberately embodied in their deed, namely, the loss of all certainty in the verdict, the impracticability of seeking for definiteness in the preliminary views, the risk of misrepresentation after disclosure of the verdict, and the impossibility of expecting any end to trials if the grounds for the verdict were allowed to effect its overthrow."

"Accordingly, it is today universally agreed that, on a mo-

tion to set aside a verdict and grant a new trial, the verdict cannot be affected, either favorably or unfavorably, by the circumstances."

There are a number of cases in Ohio and we now shall refer to them in their proper sequence.

### The Ohio Cases

**Hulet v. Barnett, 10 Ohio 459 (1841).** The question in this case arose on a motion for a new trial. It was claimed that the verdict "was procured through the improper conduct of the constable, who was much of the time, in the jury room, conversing with the jury, about the cause; that he took sides in said cause and that when he was ordered out of the room by some of the jury he replied that he was acting under oath as well as themselves."

Evidence of misconduct consisted of the **depositions** of two of the jurymen.

Grimke, J. said: "Now, if there is any rule which can be completely settled and which has been found for the purpose of setting bounds to the discretion of the court, it is that testimony of this kind **should not be received.**"

The court, continuing, said that the rule was a "wholesome one" and "it is founded upon wisest reasons of public policy."

The language of the court is **obiter dictum**, not being necessary for the decision of the case which was one for an injunction against the enforcement of the judgment. The injunction was dismissed. The court said: "There is not in reality any evidence of misconduct on the part of the jury." The misconduct was **on part of the constable** whose conduct the jury resented.

The Hulet case is overruled in the case of **Emmert v. State, 127 Oh St 235 (1933)** as to that part of the case "inconsistent" with the Emmert case. The Hulet case will be noticed again when we come to the Emmert case. They are very similar as to the facts.

The next case in Ohio upon the subject of the impeachment of the verdict of the jury by the affidavits of the jurors, is **Farrer v. State, 2 Oh St 54 (1853).**

The syllabus reads as follows: "The general rule, undoubtedly, is that affidavits of jurors are **not admissible** to impeach their verdict. But where, on motion for a new trial, **other testimony is given** to the court tending to show that the jurors, in their retirement had in their possession a newspaper, or part of a newspaper, containing a part of the charge of the court, affidavits of jurors may be received, to show what the paper was, if their possession and use of it does not involve a charge of improper motives on the part of the jurors."

"The holding of conversation by the jury, while in their room, with persons on the street, in regard to any subject of their deliberation, before their verdict is rendered is, in general, **good cause for setting aside their verdict.**"

Judge Corwin in his opinion speaking of the jurors' conversation from the windows of the jury room to people on the street, said:

"These facts do not rest on the testimony of witnesses who were of the jury * * * In the instance before us, the **foundation** to which we have referred was properly **laid** and the court, having thus made **prima facie** a case of misbehavior in the jury, **might well have considered the further facts,** which are said to be **provable by affidavits** of particular jurors."

The case of **Holman v. Riddle, 8 Oh St 385 (1857)** is the next case where the problem is discussed. The second syllabus is as follows:

"2. Affidavits of jurors, stating that they misunderstood the charge of the court, will **not be received** on motion to set aside the verdict."

This was a will contest case, Judge Swan says in his opinion:

"Practically, if a juror's affidavit, stating his idea of the law as the judge had expounded it, or the facts as he understood the witnesses, were to be held sufficient to set aside a verdict, provided it should turn out that he was mistaken in any particular, scarcely any verdict could stand. Besides the improbability that, in cases of intricacy, all the jurors would understand perfectly all the principles of law expounded to them, it would be extremely easy for a juror, who had been tampered with, to swear that he had formed his verdict upon such grounds as would insure a new trial, and it would be impossible to detect the collusion or punish perjury. The practice would hold out strong inducements for suitors to tamper with jurors. Such affidavits, therefore, upon grounds of public policy, have been in general **rejected** by courts." (Cases cited including **Hulet v. Barnett, 10 Ohio, 459**)

**Kent v. State, 42 Oh St, 426 (1884)** is the next case on this matter of impeachment by the affidavit of the jurymen themselves.

In this case it was declared to be misconduct for a jury to take his seat in the jury box "and then make to his fellow-jurors a statement of matters alleged to be **within his own knowledge,** contradicting in an important particular the testimony of one of the defendant's witnesses, and the defendant is convicted, ground is afforded by such misconduct for a new trial, where the fact is **properly made to appear,** but the affidavits of jurors **will not be regarded** for the purpose of setting

aside the verdict, until misconduct of the jury is shown **aliunde.**" (Emphasis ours.)

In his opinion in the Kent case, Judge Okey said:

"But there is no evidence of misconduct except that contained in the affidavits of jurors, and the statements in affidavits had relation alone to what took place in the jury room, and affected, in a sense, each and every juror. Hence, applying the ordinary rule, that **affidavits could not be properly considered until some evidence other than** the testimony of jurors had been offered, no case for setting aside the verdict was shown. **Farrer v. State, 2 Oh St 54:** Thompson and Merriam on Juries Ch. 21. If the law in this respect is wrong, the legislature alone should change it." ( Emphasis ours.)

We might add that some legislatures have changed the rule. Ohio has made no such change.

The next case is Janes v. Hoehn. 3 C. C. 433 (1888). The entire case is as follows: "The jury agreed to each juror to assess the amount of damages, the added total to be divided by twelve, and agreed to and did return the quotient as their verdict. This was proved only by the affidavits of jurors.

"Held: The evidence was **inadmissible** to prove such misconduct. **2 Oh St, 54.**"

The next Ohio case, in point of time, is the case of **Goin v. State, 46 Oh St 457 (1888).** The opinion is by Judge Bradburg who says, at page 471, the following:

"10. Misconduct of the jury is alleged, and the affidavits of the jurors offered to prove it, from which it appears that the jury at first stood six for assault and battery, and as a compromise the six agreed to vote for manslaughter, and the vote stood six for manslaughter and six for murder in the second degree; that it was then agreed to prepare 24 ballots, twelve for manslaughter and twelve for murder in the second degree, place all of them in a hat and each juror draw one ballot therefrom, and render a verdict either for manslaughter or murder in the second degree, as the majority should appear; that the first drawing was a tie, but the second one resulted in eight ballots for murder in the second degree and four for manslaughter, and thereupon, according to the agreement a verdict was rendered for murder in the second degree. There was **no other evidence** of this misconduct **than the affidavits of two jurors:** for, while an affidavit of the prisoner was offered in corroboration of them, it is apparent on its face that his statement was only hearsay, and for that reason properly rejected. There only remained in proof of the alleged misconduct the two affidavits of the two jurors; this was ample proof in the absence of evidence to contradict them, **if the**

evidence was competent at all. The court held them incompetent, which consequently left the allegation of misconduct without proof. The almost unbroken current of authority supports this holding (Kent v. State, 42 Oh St 426). Thompson and Merriam on Juries 539, and thus it may appear to all the world, by the subsequent statements of the jurors, that the liberty of a citizen has been gambled away in a jury room, yet the court is powerless to interfere, because the policy of the law is, first, to seclude the jury, and second, not to allow their evidence to impeach their verdict." (Emphasis ours.)

The court also referred to the "principles of public policy" and that any other rule would "endanger the stability of verdicts." The court admitted that this case "strains the principle" and expressed a desire for "a carefully guarded exception to the rule." The court finally declared that "its determination is not necessary to a decision of the case."

The case of Parker v. Blackwelder 7 C. C. 140 (1892) is a civil case, being a suit upon some notes. The jurors on Saturday, stood six to six. On Monday, in the jury room one of the jurors represented that the defendant was insolvent and that a verdict against defendant would not hurt him. Three of the jurors believed this statement and voted against the defendant. Affidavits of the three jurors were offered in evidence as ground for a new trial. Motion overruled.

Judge Woodbury, relying upon the Hulet, Farrer and Kent cases, said:

"Affidavits of jurors cannot be received after verdict to impeach the same unless evidence aliunde is first offered: and the affidavit of the attorney did not constitute such a showing aliunde" being second hand.

Wertz v. C. H. & D. Rd. Co. 110, Sec. 802 (1900) is a case by the Common Pleas Court of Butler County, decided by Judge Vandever. The question was whether the amount of a verdict rendered by the jury was $22.50 or $2,250. It all depended upon where the dot was placed. All twelve jurors stated in affidavits that the sum of $22.50 was the amount of the verdict. The third paragraph of the syllabus reads: "A verdict cannot be amended by the court on motion of the affidavits of jurors made after they have been discharged and showing such mistake."

Alms v. Andrews Bros. Co. 9 C. C. 591 (1895) is by the Circuit Court of Mahoning County and is an oral opinion by Judge Frazier where it is said: "In Kent v. State, 42 Oh St 426, it is held, 'that affidavits of jurors will not be regarded for the purpose of setting aside the verdict until misconduct of the jury is shown aliunde'."

"In the case at bar they are not seeking to invade the jury room; they are inquiring of conduct **outside** of the jury room, and during the view of the premises or place where the injury occurred. But assuming all the testimony offered to be competent, the record must clearly show there is misconduct. The idea of misconduct **outside** the jury room seems to anticipate the same motion in the Emmert case, **supra.** (Emphasis ours.)

In the Alms case, Juror L. says (it seems that the witness testified instead of filing an affidavit) that Juror R, while looking at a straightening machine where the injury occurred, said: "Anyone that puts a hand in there (in the machine) ought to be hurt."

The court concludes: "And in our opinion the plaintiff does not show himself entitled to a new trial."

Judge Houck, of the Court of Appeals of Knox County, writes the opinion in **Dodd v. McCammon, 14 Oh Ap 160 (3/20/1920)** wherein the attorney for the plaintiff filed his own affidavit in which he stated that he, the attorney, several days after the trial, had a conversation with two of the jurors in the case. Juror N, said: "That man Dodd (plaintiff below against whom a judgment was rendered on defendant's cross-petition) has been at that kind of business so long that the jury thought it was about time to **punish him** (Dodd) **a little.**"

It is stated in the opinion that "it is a well-settled proposition of law in this state that unless there is evidence **aliunde,** affidavits of jurors are not admissible to impeach their verdict."

This case also decided another proposition that is important in the matter before us. The court said that the misconduct necessary for a new trial must be such as to "clearly constitute a disqualification to properly exercise the powers of reason and judgment." Adding, it matters not "if it (misconduct) was **not caused** by the prevailing party or by anyone for him, or if it does not point to any improper prejudice or bias upon the minds of the jurors, unfavorable to the party seeking a new trial."

In **Long v. Cassiero, 105 Oh St 123 (5/16/1922)** nine of the ten jurors who signed the verdict filed affidavits "that the said verdict was made out through a mistake and misunderstanding in the charge of the court." Judge Jones in his opinion says: "It may be noted in this connection that the entry of the court does **not** even state that the motion was **heard upon the affidavits** filed in its support, but waiving the procedural question (Indicating as contended by the plaintiff's attorney in our case that **only** affidavits should be used and not the testimony of the witness) it is clear that the purport of these several affidavits is an **attempt to impeach** the

verdict signed by the individual jurors. That this **cannot be done** has been repeatedly held by this court as shown by the following cases." (Citing several of the cases noted above and adding thereto **Corrigan v. Rockefeller, 67 Oh St 354.**)

Marshall, C. J., dissents from the Long case, **supra,** claiming that "the text-books and digests are all in harmony with the proposition that mistakes which are not related to misconduct or wrong-doing should be corrected * * *" (Citing cases.)

A new and important aspect is added to the non-impeachment rule in the case of **Phillips v. Board of Education, 21 Oh Ap 194** (2/4/1924), Judge Cushing of the Court of Appeals of Pickaway County, after affirming the non-impeachment rule, added in his opinion: "These cases were decided prior to the amending of the Constitution in 1912, and the enactment of the law that three-fourths of the jury could return a verdict. The question presented is somewhat different from the facts in the decided cases. The case here presents the question of the **minority** of the jurors seeking by indirect methods to nullify the act of the majority. All that should be said on this question is that such acts are contrary to the spirit of our institutions and deserve just condemnation."

In our case only one juror was called to testify. He was not allowed to testify and the only evidence we have is the proffer of this one juror. He signed the verdict. Even if he had not signed the verdict, he alone cannot change the verdict for any reason whatsoever.

The non-impeachment rule is again upheld in **Schwindt v. Graef, 109 Oh St 404** (2/26/1924), the opinion being written by Judge Robinson. Marshall, C. J. and Allen, J. dissent.

In this case one of the jurors, the balloting then being 8 to 4, Juror S. who was voting with the minority, tossed a coin saying if it came up "heads" he would continue voting with the minority. It came "heads." He so voted on the next ballot. Juror S. did not sign the verdict. The syllabus of the case states the fact that the juror "did not join in the verdict **does not exempt such** evidence from the operation of the rule. The legislature, and not the courts, is empowered to modify or abrogate the rule."

The dissent by the Chief Justice is on about the same grounds as his dissent in the Long case, noted herein. Judge Allen dissents also.

A new application of the non-impeachment rule is found in **Corrigan v. Rockefeller, 67 Oh St 354 (1902).** After discussing the rule and agreeing with it, Judge Spear applies it to an arbitration case. The third syllabus reads: "Nor is the testimony of the arbitrators in such case **competent evidence** to impeach the award."

In more or less chronological order, we come to the case of **Emmert v. State, 127 Oh St 235 (11/8/1933)**, 187 N. E. 862, 90 A. L. R. 242 (Where a valuable annotation is found at page 249). This case reverses **13 Abs 703**. This is the test case which we will notice at length and all subsequent Ohio cases will be passed over briefly as they do not seem to embody any new law. The facts in this case, in brief, are as follows:

Emmert was the Sheriff of Lucas County and was being tried for having presented falsified accounts. He was found guilty. The third error was to the effect that the trial court refused to hear the **evidence of jurors** tending to prove that the bailiffs in charge of the jury unlawfully communicated with some members of the jury to the prejudice of the accused. Jurors M. and L. offered affidavits wherein they told of the Bailiffs, in charge of the jury, while the jury was outside the jury room getting dinner, asking "which way we were going." When told that the jury then stood 9 to 3 for acquittal, one of the bailiff's said: "My God, you are all wet. Judge Stahl expects you to return a verdict of guilty and if you don't, it will be just too bad." The juror having replied to the Bailiff that there was not enough evidence to convict, the Bailiff said: "Good Lord, what evidence do you want?" One juror was told how to switch her vote. It was intimated that a verdict must be reached **that** night.

On motion for a new trial, the facts were set forth in affidavits and the jurors were offered as witnesses. This evidence was refused. The Court of Appeals affirmed the trial court. See **13 Abs 703.**

The opinion is written by Judge Bevis, who is now President of Ohio State University.. The Ohio cases are largely reviewed, all of which, and more, are set forth in this opinion. The first case cited is the famous case of Vaise v. Delaval, 1 T. F. 11 (K. B.) decided by Lord Mansfield in 1785. This decision has been set out in full heretofore.

The opinion reads: "If, however (speaking of the privacy of the jury room) protection of the privacy of deliberations be regarded as the chief end to be subserved in this connection, there seems no good reason why jurors may not testify as to events transpiring **outside the jury room** or which constitute no part of their deliberations."

The case of Mattox v. United States, 146 U. S. 140, 13 S. Ct. 50, 36 L. Ed. 917, was relied upon by the court. In the Mattox case, a Bailiff had said to a juror: "This is the third fellow he (the defendant) has killed." The holding was that a juror may testify to "extraneous influence."

Referring to Hulet v. Barnett, supra, also an **outside inter-**

ference case—by a constable—the court said: "In so far as such expressions (In the Hulet case) are in conflict with the present holding the Hulet case is overruled." While recognizing the non-impeachment rule, the syllabus and opinion declared that the rule does not apply to "acts done or communications made to members of the jury, **outside the jury room**, or apart from their deliberations * * *."

Within a month after the decision of the Emmert case, Diersing v. Railway Co. 31 N. P. (n. s.) 358 is reported. The second syllabus reads: "Affidavits of jurors, unsupported by other evidence, held admissible as to misconduct occurring **outside the jury room**" Here, there were improper communications to the jury from the officers of the court.

On April 10, 1937, Judge Geiger of the Court of Appeals of Franklin County—our own Appellate District—decided **Lund v. Kline, 24 Abs 387.** This was a quotient verdict case. The first syllabus reads: "Where a motion for a new trial is based upon the claim that the jury reached a quotient verdict and it is sought to prove this fact by the exhibition and identification of ballots, although indicating that a quotient verdict has been returned, are **not sufficient to justify the setting aside of the verdict.**" The cases on non-impeachment are reviewed again. (Emphasis ours.)

The Lund case was reversed by Supreme Court in **133 Oh St 317,** but not upon the point quoted in **24 Abs 387.** The Supreme Court said: "The vitiating element in a 'quotient verdict' is not the acceptance of the quotient figure, but rather in the **prior agreement to be bound by such figure,** regardless of what it may be * * * Proof of a prior agreement to be bound by the quotient verdict **cannot be furnished by affidavits or testimony of the jurors themselves,** but must be by evidence aliunde * * * Misconduct of a jury will not be presumed. but must be affirmatively proved * * * Clear and positive evidence aliunde is necessary to overcome this presumption. The retrieved ballots and slips of paper do not furnish such evidence. **The affidavits of the jurors** were therefore **properly excluded.**" (Emphasis ours.)

Judge Hart writing the opinion in **State v. Adams, 141 Oh St 423 (4/28/1943)** distinguishes it from the Emmert case, **supra,** saying: "Here, there is no misconduct on the part of the jurors themselves and their testimony was not offered for the purpose of showing misconduct of any one of their members * * * The testimony related solely to the misconduct of an officer of the court while in their presence * * * The fact that in this case the communication took place **in the jury room** rather than **outside**" * * * is distinction without a difference.

In the last case, **Wicker v. City of Cleveland, 150 Oh St 434 (12/15/1948),** the non-impeachment rule is followed. In this case, Weygandt, C. J. wrote the opinion. Here, a lady juror who went past the place of the accident reported to the jury: "I passed by there and I didn't notice any depression." The opinion states: "In the instant case the alleged misconduct is that of **a juror.** Shall the rule be extended?" The answer is "No." The Chief Justice follows **39 O. Jur. Trial, 382** and **384, page 1110.**

This concludes this part of a much extended opinion. There being no evidence **aliunde** in this case as to the misconduct of the jury or jurors, therefore, this part of the motion for a new trial must be overruled.

**CROSS-EXAMINATION OF DEFENDANT IN BASTARDY CASE**

The attorney for complainant called the defendant, as for cross-examination, for his first witness. The attorney for defendant objected but the Court permitted the Cross-examination, believing that the matter was essentially civil and that the same was allowable under §11497 GC.

We had prepared in advance, a charge to the jury and expected to, and did give the charge, wherein we described the nature of a bastardy case. The charge in part reads as follows:

"I charge you this action is one which is called an action in bastardy. It is purely a statutory remedy provided by law in such cases. A bastardy proceeding, such as this case, is authorized for the benefit of the mother of the illegitimate child. The remedy thus provided is the mother's exclusive remedy in such matters.

"This action is called by the court, a quasi-criminal action for the reason that the action has some of the characteristics and essentials of a criminal action and also has some of the characteristics and essentials of an ordinary civil action. To indicate, the action is styled, using the name, the "State of Ohio." This is the same as in a criminal case. Likewise, the matter in dispute is brought to an issue by the defendant being arraigned and asked to plead either guilty or not guilty to the charge previously filed by the complainant. Here, again you have procedure in a criminal matter. This will be noted once more when you come to render your verdict. The verdict, you will be told later, shall be either guilty or not guilty. This action is begun by the filing of a complaint, that is, an affidavit signed by the complainant, which in this case, was signed by Mary Hetzler. This is the only pleading filed by either party. The plea of "not guilty" on the part of the defendant, puts in issue the entire matter. We state to you that the

action is not a criminal action but only a quasi-criminal action, meaning that it has the above features of a criminal action. These statements are made to enlighten you where you might be confused.

"Despite what we have just stated, the action is essentially and actually a civil action, which, when the issue is made up as aforesaid, casts upon the complainant the duty of proving the material allegations of her complaint by a preponderance of all the evidence."

No objection was made by either party to the charge, altho we asked for errors of commissions or of omissions. Upon request, we did charge upon the question of there being no need for corroboration of the complainant's testimony. Otherwise, the charge was accepted without objection.

The charge above is set out because it indicated as well as anything the nature of an action in bastardy. Judge Vickery adds other characteristics.

Now, the attorney for the defendant relies heavily upon **Schneider v. State, 33 Oh Ap 125**, 168 N. E. 568 (10/7/1929) decided by Court of Appeals of Cuyahoga County. Judge Vickery wrote the opinion which is concurred in by Judges Sullivan and Levine. The fifth syllabus reads as follows:

"In bastardy proceeding, it is reversible error to permit defendant to be called by counsel for the complainant and over his objection and compel him to testify against himself."

If this be correct law, provided we are compelled to follow it, then this is the end of the argument on the proposition last indicated.

We realize that we are presumptious to question the decision. We feel that the decision is not consistent within itself. It makes too many admissions as to the action being a civil action instead of criminal.

After admitting that a three-fourths verdict is proper in such a case, the court says for this purpose it is a civil case. Next, the court admits that it only requires a preponderance of the evidence to decide the matter. We never heard of any criminal case being decided by a vote of nine or more jurors. There is no such case. When did courts begin to charge juries that the defendant can be found guilty by the preponderance, or the greater weight of the evidence? We wonder if professional criminals and their lawyers have heard of this new rule on the quantum of evidence in a criminal case. Why does the court talk about the "spirit of our institutions" when it so glibbly changes the degree of proof making it easy to convict a defendant.

Judge Vickery says: "Now, so careful have the courts been of the **right** of an individual who is charged with an **offense,** that he shall not be compelled to testify against himself that it has long been recognized in Ohio that no defendant who was charged in a bastardy proceeding was ever called upon against his wishes to testify, that is, compelled to testify at the instance of the complainant." (Emphasis ours.)

Here, the court uses the word "**right**" instead of the "spirit of our institutions" and speaks of an "offense" with which the individual is charged. This is begging the question. We concede that if the charge is an "offense" then, of course, the defendant cannot be compelled to be a witness against himself. The defendant, charged with a crime—sometimes in Ohio called an "offense"—has the protection of the **Ohio Constitution, Art. I, Sec. 10.**

Most of the opinion in the Schneider case is **obiter dictum** being based upon the false assumption that an action in bastardy is a crime.

Before we discuss what is a crime as defined by the books, let us consider some other admissions made by the court on the nature of a civil action. The opinion states:

"In this connection it might be well to say, so as to distinguish it from a criminal case, that in case **the defendant were acquitted,** that is, **found not guilty,** there is **nothing** in the law that **would prevent** the complainant from making a motion for a new trial on any grounds upon which such motion might be made in civil cases, and that, if the court granted the motion, the defendant **might be tried again** and he could **not plead former jeopardy.** In other words, unlike the **ordinary criminal case,** in which, if the defendant is acquitted, no matter how erroneous the finding of the jury may be or the rulings of the judge, no action that the judge would take or that the reviewing court would take would re-establish that case against the acquitted defendant. He is **acquitted for all time.**" (Emphasis ours.)

The court seems to divide criminal cases into ordinary and "extraordinary" cases. The latter must mean quasi-criminal. A case is either criminal or civil. But a case may have the attributes of both a civil or a criminal action. In the final analysis it must be one or the other. It cannot be both.

The above quotation, it seems, is one of the best arguments that can be made, that a bastardy action is a civil action. In an "ordinary" criminal action, if the State fails to convict, altho a great mistake of law has been made, still the defendant cannot be tried again. If the exceptions made

by the State are sustained, it has no effect on the case in which the exceptions were taken, but the rule of law established is a guide to the next similar case. This is a far cry from indicating a criminal action.

The court complains that "we do not find * * * anywhere in Ohio where a man has been compelled to testify at the instance of the complainant." Even, if this is correct, what does it mean? There is always a first case. The argument is a negative one.

The court says "There are a **great many** cases in Ohio where the courts have held that in a quasi-criminal action it was error to compel the defendant to testify over his objection—**none perhaps being a case like the instant case.**" Continuing, the opinion said "no one would attempt to make a defendant testify against himself." But the learned Judge does not cite a single case out of the "great many" cases. (Emphasis ours.)

Looking at **Part Third: Remedial** Title IV, Procedure in the Common Pleas Court, we find Nine Divisions. Division Eight is entitled Quasi-Criminal Actions. In Division Eight, we find Amercement, **Bastardy** and Contempt of Court. (Emphasis ours.)

The court in the Schneider case, **supra,** after stating there is no case like the instant case immediately turns to the consideration of **cases in contempt.** Of course, we agree that the defendant in a contempt case—the same being out of the presence of the court—cannot be cross-examined. But **this is not a contempt case.**

Again, the Schneider case admits a bastardy "action is prosecuted for the benefit of the **putative mother** for her care, maintenance, and so forth, and the benefit of the judgment is to her." How could a mother be putative? She is known.

**Atloecz v. Coma, 15 Abs 363 (1932),** Court of Appeals of Summit County says that "it is now settled in Ohio that such proceedings (bastardy) are controlled by the code of **civil procedure.**"

**Durst v. Griffith, 43 Oh Ap 44 (1932)** the Court of Appeals of Hocking County, Syllabus 2: "While some of the procedure in a bastardy case is similar to that in a criminal case, the procedure is a **civil one.**"

State, ex rel. Wernery v. Lageman, 77 N. E. (2d) 478, C. P. Court of Hamilton County is a decision by Judge Hess, decided January 5, 1948. The fourth syllabus is as follows:

"A bastardy proceeding is in the category of "civil cases" and should **follow civil trial procedure.** The opinion: "The

decisions in Ohio and other jurisdictions actually have **eliminated** the quasi-criminal feature and placed bastardy proceeding in the **category of civil cases.** If it is civil in its nature then it **should follow civil trial procedure.** Any other conclusion would lead to unnecessary confusion." (Emphasis ours.)

According to **Reams v. State ex rel Favors, 53 Oh Ap 19** (2/14/1948) by the Court of Appeals of Logan County: "A bastardy proceeding is a **civil action** in which a verdict may be rendered by the concurrence of three-fourths of the jury, and only a preponderance of the evidence is necessary to justify a verdict of guilty." (Emphasis ours.)

**Sec. 11497 GC,** "At the instance of the **adverse party,** a party may be examined as if under cross-examination, either orally or by deposition, like any other witness."

Who is an "adverse party"? "Adverse party" is defined in 2 Words and Phrases, p. 568 as follows: "The term 'adverse party' is construed to embrace any person whose personal or property or other right may be **adversely affected** by the operation of the judgment or the final relief sought in the proceeding." Weeks v. Berschauer, 140 Kan. 241, 36 P (2d) 81.

In the case of **Bates v. Flath, 81 Oh Ap 188, 36 O. O. 511,** it is held that §11497 GC is a remedial statute giving "a party the right to cross-examine the adverse party and should be **construed liberally.**"

Surely, the **defendant** in a bastardy action is an "adverse party" to the **complainant,** who, since the amendment in 1923 and thereafter **(117 Oh. L. 808** and **119 Oh. L. 735)** is the sole beneficiary under the bastardy act. The last amendments have removed from §12123 GC all aspects of a criminal case and non-support of an illegitimate child now comes under §13008 GC, which is really criminal.

**Sec. 13441-1 GC** Rules applicable to criminal cases: "The rules of evidence in civil causes insofar as the same are applicable, shall govern in all criminal causes, except as otherwise provided in this code." (Criminal Code.) This statute covers §11497 GC, even if a bastardy case be criminal in its nature, thus, permitting the defendant to be called for cross-examination.

In **State, ex rel. Beebe v. Cowley, 116 Oh St 377 (4/12/1927)** the opinion by Judge Jones makes clear the adverse character of such a proceeding. After the amendments of 1923, he says, "the defendant (shall) pay to the complainant such sum as the court may find necessary for **her support, maintenance and necessary expenses caused by the pregnancy and**

childbirth." It is her support. Formerly, the State of Ohio was an interested party to see that the illegitimate child did not become a public charge. Continuing: "Prior to the amendment (1923) the statute provided that the reputed father of the illegitimate child should stand charged with its maintenance in such sum as the court orders * * * But as the statute now stands, that provision (for the child's support) has been eliminated and in lieu thereof provisions are made for her (mother's) support.

Could there be any action more adversary than the present bastardy action? The judgment is now no different than a judgment upon an account for money only. True, the reputed father has the duty to support his child. It is his moral duty and the State will see that he supports it by the non-support machinery of the statutes. **Sec. 13008 GC.**

## WHAT IS A CRIME?

Miller on Criminal Law (1934), page 16, says:

"Crime may be generally defined as the commission or omission of an act which the law forbids or commands under pain of a punishment to be imposed by the state by a proceeding in its own name. In most cases the law requires that the commission or omission of the act must be accompanied by an unlawful intent."

For further definitions of a crime or an offense: See 12 O. Jur. Criminal Law, pg. 44, Sec. 3. 1 Wharton on Criminal Law Sec. 14, 16 C. J. Sec. 1, 22 C. J. S. Sec. 1: "A crime is a wrong directly or indirectly affecting the public to which the state has annexed certain punishment and penalties, and which is prosecuted in its own name in what is called a criminal proceeding." Also see 15 Am. Jur. Sec. 2 (Criminal Law.)

The nature of an act constituting a crime is defined in **State v. Frazier, 37 Oh St 78 (1881)** decided by Chief Justice Boynton. The act of May 4, 1859, attempted to confer jurisdiction upon the Probate Court in a matter of keeping of the peace. The court was not allowed to take jurisdiction because an action on a peace warrant is **not a crime or a misdemeanor.** The Probate Court only had jurisdiction over crimes and misdemeanors. In the opinion: "The jurisdiction which that act conferred related wholly to crimes and misdemeanors (Speaking of the jurisdiction of the court). These are offenses against the statute involving punishment therein prescribed. They are acts of **commission or omission** in violation of law forbidding or commanding them. The **object** of a peace proceeding is to **obtain security** against the commission of a crime from whose conduct is such as to afford a reasonable ground to believe that he contemplates

an offense against the person or property of another. **Such conduct,** however, **is not a crime or misdemeanor** within the meaning of the statute * * *." (Emphasis ours.)

There are but two kinds of actions, civil and criminal. It is evidence that a bastardy action is not criminal, therefore, it must be civil and subject to the rules of a civil trial.

Again, the defendant took the stand of his own accord and as part of his own defense. His testimony **then** was the **same** as when he was being cross-examined. There was no prejudice against the defendant in any manner by his being cross-examined. If there was any error in his being cross-examined, **did he not waive** it when he voluntarily took the stand in his own defense? There was no motion to strike out the cross-examination.

Therefore, on the second ground also, we over-rule the motion for a new trial.

### AGENDA
November 20, 1951.

It will be noticed that the above decision by us was rendered on May 10, 1950. No appeal was taken from our decision.

Only two days ago, we received **Volume 59** of **Ohio Law Abstract** and on **page 113, Syl. 1** we read the following:

"1. **Sec. 13444-3 GC** and **Art. I, Sec. 10 of the Ohio Constitution** are **not violated** by calling the defendant on cross-examination in a bastardy proceeding on the theory that such a proceeding is a criminal case."

The above is quoted from the syllabus of the case of State, ex rel. Simons, plaintiff-appellant v. Kiser, defendant-appellee, decided on November 24, 1950 by the Appellate Court of Darke County, Ohio. The opinion is written by Wiseman, J., and is concurred in by both Miller, J., and Hornbeck, J. This decision comes from our own appellate district. The Schneider case, **supra** is cited but the Second Appellate refuses to follow the Schneider case. There does not appear to be any certification on account of a conflict.

Therefore, we now have two appellate decisions on the same proposition of law. Our own reasoning may be helpful in making a choice.